UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

———————————————————————

| | |
|---|---|
| AHMED KAMAL, on behalf of himself and the putative class, | ) ) ) |
| Plaintiff, | ) Case No. 2:15-cv-00190-WJM-MF |
| v. | ) ) |
| J. CREW GROUP, INC., *et al.*, | ) Returnable:    July 18, 2016 |
| Defendants. | ) ) ) |

———————————————————————

---

### PLAINTIFF'S MEMORANDUM OF LAW IN
### OPPOSITION TO DEFENDANTS' SECOND MOTION TO DISMISS
### THE AMENDED COMPLAINT

---

**FRANK LLP**
275 Madison Avenue, Suite 705
New York, New York 10016
(212) 682-1853 Telephone
(212) 682-1892 Facsimile

*Co-Counsel for Plaintiff and the Class*

*On the Brief*

Marvin L. Frank
Gregory A. Frank

## <u>TABLE OF CONTENTS</u>

**THE THIRD CIRCUIT JUST REJECTED J CREW'S ARGUMENTS** ............................. 1

**PRELIMINARY STATEMENT** .................................................................. 2

**BACKGROUND** ...................................................................................... 3

    I.   Procedural History Of This Case ................................................... 3

    II.   *Spokeo* Is Of Limited Scope ......................................................... 4

**STANDARD OF REVIEW** ........................................................................ 4

**ARGUMENT** ........................................................................................... 5

    III.   *Spokeo* Validates, Not Undermines, Plaintiff's Article III Standing ............... 5

        A.   Plaintiff Has Suffered Injury In Fact ..................................... 5

        B.   *Spokeo* Reiterates Deference To Congressional Determination Of Harm ................. 7

        C.   Congress Passed FACTA, Having Determined That Harms Emanate From The Misconduct Alleged Herein ................. 8

        D.   A Court Must Consider Historical Origins Of Protected Rights ................. 10

        E.   Invasion Of A Legally Protected Interest Has Always Conferred Standing In This Circuit ................. 12

        F.   FACTA Is Not An Unusual Statute ..................................... 13

    IV.   J. Crew's Arguments All Fail ...................................................... 16

        A.   J. Crew's Reliance on *Reilly* Is Misplaced ................. 16

        B.   J. Crew's Reliance On *Spokeo*'s Dicta Concerning "Bare" Violations Is Misplaced ................. 18

        C.   *Spokeo* Does Not Require Plaintiffs To Show Pecuniary Harm In Order To Establish Article III Standing ................. 19

        D.   *Spokeo* Recognizes That The Danger Of Third-Party Misconduct Gives Rise To Article III Standing ................. 20

    V.   Plaintiff Has Established All Article III Standing Requirements ................. 21

**CONCLUSION** ......................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alston v. Countrywide Fin. Corp.*, 585 F.3d 753 (3d Cir. 2009) ............................................... 3, 12

*Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708 (9th Cir. 2010)............................................ 15

*Bednarik v. Bednarik*, 16 A.2d 80 (N.J. Ch. 1940)........................................................................ 11

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................................... 21

*Block v. Meese*, 793 F.2d 1303 (D.C. Cir. 1986).......................................................................... 21

*Bowman v. Wilson*, 672 F.2d 1145 (3d Cir. 1982).......................................................................... 5

*City Select Auto Sales, Inc. v. David Randall Assocs.*, 296 F.R.D. 299 (D.N.J. 2013) ............... 12

*Constitution Party of Pa. v. Aichele*, 757 F.3d 347 (3d Cir. 2014)................................................. 5

*Crisafulli v. Ameritas Life Ins. Co.*, No. 13-5937,

   2015 U.S. Dist. LEXIS 56499 (D.N.J. Apr. 30, 2015) ............................................................ 17

*Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286 (3d Cir. 2005)...................................... 5, 18

*DiLorenzo v. Edgar*, No. 03-841-SLR,

   2004 U.S. Dist. LEXIS 4991 (D. Del. Mar. 24, 2004) ............................................................ 14

*Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170 (2d Cir. 2012) ..................... 13, 14, 15

*Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406 (3d Cir. 2013)........................................ 10

*Feder v. Williams-Sonoma Stores, Inc.*, No. 2:11-03070 (WHW),

   2011 U.S. Dist. LEXIS 109739 (D.N.J. Sept. 26, 2011) ........................................................ 13

*Gratz v. Claughton*, 187 F.2d 46 (2d Cir. 1951).................................................................... 15, 16

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................................... 2, 20

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,

   806 F.3d 125 (3d Cir. 2015) ............................................................................................ passim

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,

   988 F. Supp. 2d 434 (D. Del. 2013)........................................................................................... 6

*In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, No 2:13-cv-07418-CCC-JBC, 2015

   U.S. Dist. LEXIS 41839 (D.N.J. Mar. 31, 2015)..................................................................... 17

*In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443 (SRC),

   2014 U.S. Dist. LEXIS 91286 (D.N.J. July 2, 2014)...................................................... 3, 7, 12

*In re Nickelodeon Consumer Privacy Litig.*, No. 15-1441,

 2016 U.S. App. LEXIS 11700 (3d Cir. June 27, 2016) ..................................................... passim

*Lujan v. Defenders of Wildlife*, 504 U. S. 555 (1992) ............................................................. 7, 14

*McGuire v. Shubert*, 722 A.2d 1087 (Pa. Super. Ct. 1998) ........................................................ 11

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208 (3d Cir. 2013) ................. 8, 20

*Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68 (Ga. 1905) ........................................................ 11

*Pichler v. UNITE*, 542 F.3d 380 (3d Cir. 2008 ...................................................................... 12, 13

*Reilly v. Ceridian Corp.*, 664 F.3d 38 (3d Cir. 2011) ................................................................ 16

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418 (1972) ................................................. 15

*Salvati v. Deutsche Bank Nat'l Trust Co., N.A.*, 575 F. App'x 49 (3d Cir. 2014) ....................... 13

*Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct. 1540 (2016) ............................................ passim

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118 (1939) ........................................... 20

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973) ...... 5

*Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ....................... 11

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................................................... 7

**Constitutional Provisions**

U.S. Const. art. III, § 2 ........................................................................................................... passim

**Statutes**

15 U.S.C. § 78p(b) ............................................................................................................ 13, 14, 15

15 U.S.C. § 1681a ......................................................................................................................... 17

15 U.S.C. § 1681b ......................................................................................................................... 17

15 U.S.C. § 1681c(g) ............................................................................................................... passim

15 U.S.C. § 1681e ......................................................................................................................... 17

15 U.S.C. § 1681n.......................................................................................................................... 21

Credit and Debit Card Receipt Clarification Act of 2007,

 Pub. L. 110-241, 122 Stat. 1565 ......................................................................................... 8, 10

**Rules**

Federal Rule of Civil Procedure 12(b)(1)……………………………………………………5

**Other Authorities**

Answering Br. of Def.-Appellee Google Inc.,

    *Google Cookie*, No. 13-4300 (3d Cir. Apr. 7, 2014) ............................................... 16

Br. of Appellee Viacom Inc.,

    *Nickelodeon II*, No. 15-1441 (3d Cir. June 15, 2015) ........................................... 16

Brief in Support of Statute by United States of America as Intervenor,

    *Papazian v. Burberry Ltd.*, No. 2:07-cv-01479-GPS-RZ (C.D. Cal. July 24, 2007)................. 9

Bureau of Justice Statistics, U.S. Dep't of Justice,

    "Victims of Identity Theft, 2012" (Dec. 2013).......................................................... 8

Consol. Class Action Compl., *In re Horizon Healthcare Servs., Inc. Data Breach Litig.*,

    No 2:13-cv-07418-CCC-JBC (D.N.J. June 27, 2014) ........................................... 17

Post-Argument Letter Brief by Amicus Curiae Public Justice, P.C.,

    *Cruper-Weinmann v. Paris Baguette Am., Inc.*, No. 14-3709 (2d Cir. June 17, 2016) ........... 11

President George W. Bush, Remarks at FACTA Signing Ceremony (Dec. 4, 2003) ................... 9

Press Release, Fed. Trade Comm'n,

    "FTC Releases Annual Summary of Consumer Complaints" (Mar. 1, 2016)........................... 8

Statement of Sen. Richard Shelby in Support of Passage of FACTA,

    149 Cong. Rec. 26,891 (2003)................................................................................ 14

*Tournier v. Nat'l Provincial & Union Bank of Eng.*, (1923) 1 K.B. 461 .................................... 11

**Treatises**

Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890)...... 11

Plaintiff Ahmed Kamal, by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to Defendants' (collectively, "J. Crew") motion to dismiss the Amended Complaint (Dkt. No. 21), pursuant to Federal Rule of Civil Procedure 12(b)(1).  Plaintiff has adequately pleaded U.S. Const. art. III, § 2 standing.

## THE THIRD CIRCUIT JUST REJECTED J CREW'S ARGUMENTS

Two days ago, the Third Circuit disposed of the standing question raised by J. Crew, holding that a plaintiff suffers a particularized and concrete injury-in-fact when a defendant unlawfully discloses his legally protected information:

> [*Spokeo* did not] call[] into question whether the plaintiffs in this case have Article III standing.  The purported injury here is clearly particularized, as each plaintiff complains about the disclosure of information relating to his or her [financial data].  While perhaps "intangible," the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information.  Insofar as *Spokeo* directs us to consider whether an alleged injury-in-fact "has traditionally been regarded as providing a basis for a lawsuit," [the Third Circuit previously] noted that Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private.

*In re Nickelodeon Consumer Privacy Litig.*, No. 15-1441, 2016 U.S. App. LEXIS 11700, at *22 (3d Cir. June 27, 2016) ("*Nickelodeon II*") (Attached as Exhibit A to Frank Declaration) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. ___, 136 S. Ct. 1540, 1549 (2016) ("*Spokeo*")).[1]

Further, *Nickelodeon II* rejects Defendants' argument that there was no injury-in-fact, because the probability of actual economic loss was somehow too remote.  As the *Nickelodeon II*

---

[1]  *Nickelodeon II* specifically rejects J. Crew's argument that *Spokeo* "eviscerates Kamal's claims of standing."  Defs.' Br. at 2; *see Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *19 ("The Supreme Court's recent decision in *Spokeo, Inc. v. Robins* does not alter our prior analysis in [*In re*] *Google* [*Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 134 (3d Cir. 2015) ("*Google Cookie*")].")

Court observed, "focus on 'economic loss is misplaced.'"[2]   Instead, "injury-in-fact 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing.'"[3]

Finally, the *Nickelodeon II* Court set forth a clear directive for the proper test for Article III injury.  Specifically:

> [*Spokeo*] noted that even certain kinds of "intangible" harms can be "concrete" for purposes of Article III.  When evaluating whether such a harm qualifies as an injury-in-fact, judges should consider whether the purported injury "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts."  Congress's judgment on such matters is "also instructive and important," meaning that Congress may "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law."

> Intangible harms that may give rise to standing also include harms that "may be difficult to prove or measure," such as unlawful denial of access to information subject to disclosure. [4]

## PRELIMINARY STATEMENT

The statute at issue here, the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"),[5] is part of the Fair Credit Reporting Act ("FCRA"),[6] and codifies procedures that prohibit violations of statutorily protected privacy rights in order to protect consumers from the possibility that their private financial information might be released to the public space.  *See infra* Part III.C.   To do so, Congress elevated the privacy-invasion harm caused by printing consumers' financial data to an injury that is cognizable at law.  Congress did this <u>twice</u> because

---

[2]  2016 U.S. App. LEXIS 11700, at *19 (quoting *Google Cookie*, 806 F.3d at 134).

[3]  2016 U.S. App. LEXIS 11700, at *19 (quoting *Google Cookie*, 806 F.3d at 134 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982))).

[4]  2016 U.S. App. LEXIS 11700, at *21 (quoting *Spokeo*, 136 S. Ct. at 1549 (internal quotation marks and citations omitted)).

[5]  15 U.S.C. § 1681c(g).

[6]  15 U.S.C. § 1681 *et seq*.

it recognized that identity theft is pervasive, devastating to consumers, while simultaneously being difficult to trace and quantify. As in all such previous circumstances, Congress managed the problem by enacting a flat rule against printing consumers' private data.

Plaintiff here alleges that J. Crew violated FACTA by including 10 of the 16 digits of his credit card number on receipts generated during credit card transactions that took place at J. Crew retail stores located in New Jersey, Maryland and Delaware. Am. Compl. ¶¶ 68–70.

It has always been the law in this Circuit that a plaintiff enjoys Article III standing when he alleges that the defendant's conduct has invaded one or more of his statutorily protected privacy rights. *See, e.g.*, *Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at \*22–23; *Google Cookie*, 806 F.3d at 134–135; *In re Nickelodeon Consumer Privacy Litig.*, MDL No. 2443 (SRC), 2014 U.S. Dist. LEXIS 91286, at \*17 (D.N.J. July 2, 2014) (Chesler, J.) ("*Nickelodeon I*") ("The 'legally protected interest' [giving rise to Article III standing] can be—and often is—property-based or financial. But it need not be.") (citing *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763 (3d Cir. 2009)).

Accordingly, Plaintiff here has properly pleaded injury in fact for Article III standing purposes in this Circuit, because the privacy-invading "events that the [Amended C]omplaint describes are concrete, particularized, and actual as to" Plaintiff.[7]

## BACKGROUND

### I.     Procedural History Of This Case

After *certiorari* was granted in *Spokeo*, this Court stayed the instant action pending the Supreme Court's decision (Dkt. Nos. 44–45); following the publication of that decision, this

---

[7] *Google Cookie*, 806 F.3d at 135; *see Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at \*22.

Court granted J. Crew leave to file the instant motion (Dkt. Nos. 46–47, 49).  J. Crew now makes its second attempt to dismiss the Amended Complaint.

**II.**       *Spokeo* **Is Of Limited Scope**

It is unsurprising that the *Nickelodeon II* court was dismissive of the effects of *Spokeo*'s holding.  *Spokeo* must be analyzed in the context of its bizarre facts and unusual theory of harm.  The plaintiff in *Spokeo* alleged that he had somehow been harmed by the defendant, a so-called "people search engine" Web site, because it had publicly stated on the Internet—incorrectly, according to the plaintiff—"that he is married, has children, is in his 50's, has a job, is relatively affluent, and holds a graduate degree."  *Spokeo*, 136 S. Ct. at 1544, 1546.  The *Spokeo* plaintiff's bizarre theory was that he was somehow harmed because the allegedly incorrect information was too positive.  *Id.* at 1554.

As the Third Circuit observed, the *Spokeo* Court concluded that the Ninth Circuit had failed to even consider whether the plaintiff's bizarre theory of harm met the concreteness element—and remanded back to the Ninth Circuit with instructions to do so.  *See Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *20-21; *Spokeo*, at *18 (the Ninth Circuit "did not address the question framed by our discussion, namely, whether the particular procedural violations alleged in this case entail a degree of risk sufficient to meet the concreteness requirement.").  Clearly, the *Spokeo* Court was skeptical that the plaintiff was harmed because he was made to look like a happy, productive citizen, and the Third Circuit was unimpressed from the dicta born of the unusual facts in that case.

### STANDARD OF REVIEW

J. Crew argues that this Court lacks subject matter jurisdiction because the facts as pleaded by Plaintiff are insufficient to establish his constitutional standing.  In weighing such a

4

Rule 12(b)(1) motion, a court must consider the plaintiff's allegations, and any documents referenced therein or attached thereto, in the light most favorable to the plaintiff. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014).

"Injury-in-fact is not Mount Everest." *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (Alito, J.). "The contours of the injury-in-fact requirement, while not precisely defined, are very generous. Once a plaintiff has alleged some specific, 'identifiable trifle' of injury that is fairly traceable to the defendant's conduct, the requirement of a constitutionally adequate stake in the controversy is satisfied." *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982) (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)) (internal citations omitted and emphasis added); *accord, e.g.*, *Danvers Motor Co.*, 432 F.3d at 294.

## ARGUMENT

## III. *Spokeo* Validates, Not Undermines, Plaintiff's Article III Standing

As *Nickelodeon II* explains, *Spokeo* affirms that courts must defer to Congress's prerogative to elevate harms that, like those involving invasion of privacy, are deeply rooted in Anglo-American legal history. 2016 U.S. App. LEXIS 11700, at *21. Third Circuit courts have repeatedly recognized Congress's ability to identify privacy-violation harms and elevate them to injuries in fact sufficient to confer Article III standing.

### A. Plaintiff Has Suffered Injury In Fact

First and most importantly, J. Crew's brief entirely ignores Plaintiff's primary theory of injury-in-fact: that Plaintiff was injured by an invasion of his statutorily protected privacy rights when J. Crew improperly printed his credit card information on its receipts.[8]

---

[8] *See* Am. Compl. ¶¶ 1–2, 23–24, 68–70.

As discussed in greater detail above, under *Nickelodeon II*, Plaintiff's injury here is concrete, because it was in the form of "the unlawful disclosure of legally protected information," and particularized, because Plaintiff "complains about the disclosure of information relating to his" "personal interest in the handling of his credit information." *Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *22.  As *Spokeo* observed, a plaintiff "need not allege any <u>additional</u> harm beyond the one Congress has identified."  *Spokeo*, 136 S. Ct. at 1549 (emphasis in original).

Plaintiff's standing is further supported by the Third Circuit's holding in *Google Cookie*, which addressed a challenge to the Article III standing of Internet users who alleged that Google violated their privacy rights by manipulating loopholes in commonly used browsers so as to circumvent ad-blocker protections.  *Google Cookie*, 806 F.3d at 130–33.  These circumventions subjected the *Google Cookie* plaintiffs to an unquantifiable but enhanced risk of unwanted, targeted advertising by third-party advertisers able to study the users' online browsing habits.  *Id.*

The district court in that case had suggested that, because the plaintiffs had not incurred any monetary loss as a result of the alleged invasions of their privacy, they had not alleged an injury in fact sufficient to confer Article III standing.  *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 988 F. Supp. 2d 434, 441–42 (D. Del. 2013).  The Third Circuit flatly rejected any such conclusion, stressing that the plaintiffs' claims were concrete, because the conduct infringed upon their statutorily protected privacy rights.  *Google Cookie*, 806 F.3d at 134–35 ("[I]n the course of serving advertisements to their <u>personal</u> web browsers, [the defendants] implanted tracing cookies on their <u>personal</u> computers. . . .  [T]he events that the complaint describes are concrete, particularized, and actual as to the plaintiffs.") (emphases in original).  "Sure enough," the Third Circuit noted, "the Supreme Court itself has permitted a

plaintiff to bring suit for violations of federal privacy law absent any indication of pecuniary harm." *Id.* at 134.

Similarly, even before the Third Circuit weighed in with *Nickelodeon II*, Judge Chesler already held in *Nickelodeon I* that an injury in fact had been sufficiently alleged where a company with several children's entertainment Web sites was accused of violating various privacy acts for sharing with its business partners the personally identifiable information of children who had created online profiles on those sites. *Nickelodeon I*, 2014 U.S. Dist. LEXIS 91286, at *4–10, *14–19. "Indeed, it has long been the case that '[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing . . . .'" *Id.* at *16 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)).

B.   *Spokeo* Reiterates Deference To Congressional Determination Of Harm

*Nickelodeon II* quotes heavily from *Spokeo* in emphasizing the importance of courts' deference to Congressional determinations of what harms constitute an injury in fact. *Spokeo*, 136 S. Ct. at 1549 ("[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is[] instructive and important. . . . Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" (quoting *Lujan v. Defenders of Wildlife*, 504 U. S. 555, 578 (1992))); *Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *21 (same).

"'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" *Spokeo*, 136 S. Ct. at 1549

(quoting *Lujan*, 504 U.S. at 580)).  In addition, *Spokeo* emphasizes that "the risk of real harm" may suffice to confer Article III standing.  136 S. Ct. at 1549.[9]

> C.  Congress Passed FACTA, Having Determined That
>      <u>Harms Emanate From The Misconduct Alleged Herein</u>

The very privacy-invading misconduct alleged by Plaintiff here[10] has <u>twice</u> been the subject of Congressional action affirming Congress's intention to imbue consumers' credit card information with a statutorily protected privacy right, and to subject merchants to private-action liability.  *See* Credit and Debit Card Receipt Clarification Act of 2007 ("Clarification Act"), Pub. L. 110-241, § 2(a)(2), -(6), 122 Stat. 1565, 1565.

Congress has investigated and determined that the risk of harm through identity theft is so qualitatively wrong as to merit statutory protection.  *See* Clarification Act § 2(a)(1)–(2), -(6). Identity theft is a problem so pervasive in America that it has topped the Federal Trade Commission's list of consumer complaints for 15 years.[11]   In 2012, as noted in Plaintiff's Amended Complaint, roughly 7% of all U.S. residents age 16 or older were victims of at least one incident of identity theft.[12]

---

[9]   Third Circuit precedent reflected this notion well before *Spokeo* was decided.  *See Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 221–23 (3d Cir. 2013) ("*NCAA*") (athletic leagues challenging state law permitting sports betting on amateur and professional contests had constitutional standing, under theory that the state law exposed the leagues to risk of reputational harm).

[10]  Am. Compl. ¶¶ 68–70.

[11]   *See* Press Release, Fed. Trade Comm'n, "FTC Releases Annual Summary of Consumer Complaints"  (Mar.  1,  2016),  *available  at*  https://www.ftc.gov/news-events/press-releases/2016/03/ftc-releases-annual-summary-consumer-complaints.

[12]  Bureau of Justice Statistics, U.S. Dep't of Justice, "Victims of Identity Theft, 2012" (Dec. 2013), *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf; *see* Am. Compl. ¶ 41.

Congress enacted FACTA in 2003 in response to the rampant growth of credit/debit card fraud and identity theft, facilitated in large part by the increasing number of sophisticated criminal syndicates relying on rapidly expanding technology.  FACTA renders it more difficult for identity thieves to obtain consumers' credit card information by reducing the amount of information that identity thieves can retrieve from found or stolen credit card receipts.  As President Bush declared when signing FACTA into law:

> This bill also confronts the problem of identity theft.  A growing number of Americans are victimized by criminals who assume their identities and cause havoc in their financial affairs.  With this legislation, the federal government is protecting our citizens by taking the offensive against identity theft.

President George W. Bush, Remarks at FACTA Signing Ceremony (Dec. 4, 2003).

The U.S. Department of Justice ("DOJ") has confirmed the causal link between the information protected by FACTA and credit card identity theft.  In *Papazian v. Burberry Ltd.*, No. 2:07-cv-01479-GPS-RZ (C.D. Cal.), for example, the DOJ filed a brief that explained the purpose of FACTA and why compliance is so important:

> The goal of the provision that became § 1681c(g) was "to limit the opportunities for identity thieves to 'pick off' key card account information."  S. Rep. No. 108-166 (2003).  FACTA followed enactment of laws in at least 20 states with provisions similar to § 1681c(g) that prohibited printing the full card number as well as the expiration date on receipts.  . . .
> . . . .
> <u>Defendant's argument that a thief would not be able to make fraudulent charges using *only* a truncated card number and the full expiration date misses the point</u>.  Thieves might piece together (or 'pick-off,' in the words of Congress) different bits of information from different sources. . . .  Congress' actions comport with common experience, testimony provided in support of the legislation, and the instructions credit card companies give to merchants. . . .

Brief in Support of Statute by United States of America as Intervenor 13–16, *Papazian v. Burberry Ltd.*, No. 2:07-cv-01479-GPS-RZ (C.D. Cal. July 24, 2007) (emphasis added), *filed as* Exhibit A to Ex Parte Application to Intervene, ECF No. 24.

Congress knew that <u>only</u> persons in Plaintiff's position (those who received from a merchant printed credit card receipts bearing the consumer's private financial information) would suffer harm, and that they would specifically suffer the harm Congress had contemplated (the possibility that identity thieves would be able to invade consumers' privacy and exploit their financial resources). Thus, the fundamental "principles" underlying FACTA "provide further support for th[e] conclusion" that Congress intended for Plaintiff and similarly harmed individuals to be able to file private actions under FACTA against merchants that have violated their FACTA-protected rights. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414–416 (3d Cir. 2013) (beneficiary of life insurance plan governed by Employee Retirement Income Security Act of 1974 ("ERISA") had Article III standing to seek disgorgement of investment profits that insurer did not pass along to her, even though she received all benefits owed under the policy).

Moreover, by the time of the passing of the Clarification Act, four years after FACTA was first passed, Congress had re-investigated the harm stemming from merchants' improperly printing more than five digits of credit card numbers on customer receipts, and unequivocally re-affirmed that merchants that engaged in this practice, such as J. Crew here, would continue to be subjected to stiff penalties. Clarification Act § 2(a)(1)–(2), -(6). In short, Congress <u>twice</u> required merchants to suppress the printing of credit card numbers, because it had <u>twice</u> found that such printing was harmful.

D.  <u>A Court Must Consider Historical Origins Of Protected Rights</u>

Both *Spokeo* and *Nickelodeon II* stress the importance of considering the historical origins of a statutorily protected right when assessing the concreteness of an injury in fact resulting from the violation thereof:

> Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts.

*Spokeo*, 136 S. Ct. at 1549 (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 775–77 (2000)); *accord Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *21.

Congress's ability to define the boundaries of a party's privacy rights stems from ancient legal concepts.[13]  The right of privacy is "derived from natural law," and was recognized by Roman and early-English jurisprudence.  *Pavesich v. New Eng. Life Ins. Co.*, 50 S.E. 68, 70 (Ga. 1905), *cited with approval in Bednarik v. Bednarik*, 16 A.2d 80, 90 (N.J. Ch. 1940) ("The right of privacy has its foundation in the instincts of nature."); *see also* Samuel D. Warren & Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 195 (1890) ("[N]umerous mechanical devices threaten to make good the prediction that 'what is whispered in the closet shall be proclaimed from the house-tops.'").

Moreover, and especially relevant here, English common law has traditionally recognized a specific right to privacy of information pertaining to individuals' financial accounts.  In 1923, the English Court of Appeal identified the common-law right to strict confidence of bank account information, arising from an implied contractual duty of nondisclosure.  *See McGuire v. Shubert*, 722 A.2d 1087, 1090 (Pa. Super. Ct. 1998) (discussing *Tournier v. Nat'l Provincial & Union Bank of Eng.*, (1923) 1 K.B. 461)).

---

[13]  For a more thorough discussion of this topic, see Post-Argument Letter Brief by Amicus Curiae Public Justice, P.C., *Cruper-Weinmann v. Paris Baguette Am., Inc.*, No. 14-3709 (2d Cir. June 17, 2016) (Attached as Exhibit B to Frank Decl.).

E.  Invasion Of A Legally Protected Interest Has
    Always Conferred Standing In This Circuit

In *Nickelodeon II*, the Third Circuit considered the impact of *Spokeo* on this Circuit's Article III standing law, and concluded that *Spokeo* had confirmed, not called into question, this Circuit's existing standing principles.  *See Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *22 ("None of the[] pronouncements in *Spokeo* calls into question whether" plaintiffs who alleged invasions of statutorily protected privacy rights "have Article III standing.").

Even before *Spokeo*, courts in this Circuit repeatedly upheld Congress's prerogative to prohibit invasions of privacy that are deemed unacceptable as a matter of law.  *See Google Cookie*, 806 F.3d at 134–35; *Nickelodeon I*, 2014 U.S. Dist. LEXIS 91286, at *16–19; *City Select Auto Sales, Inc. v. David Randall Assocs.*, 296 F.R.D. 299, 309–10 (D.N.J. 2013) (Simandle, C.J.) (plaintiff subjected to unwanted faxes did not have to show "specific harms" in order to establish Article III standing to sue under Telephone Consumer Protection Act); *cf. Pichler v. UNITE*, 542 F.3d 380, 390–91 (3d Cir. 2008) (spouses of vehicle owners would have had Article III standing to bring Driver's Privacy Protection Act claims over unlawful accessing of private motor vehicle records if their names had been on the registrations for the vehicles in question).

Even before *Google Cookie* and the *Nickelodeon* cases, courts within the Third Circuit recognized Congress's ability to identify harms frequently suffered by consumers that are difficult to quantify, and to assign procedural rights to consumers in order to ensure that businesses will not engage in conduct that subjects consumers to such harms.  *See Alston*, 585 F.3d at 762–63 (home buyers exposed to kickback scheme in private mortgage insurance market had Article III standing to sue under Real Estate Settlement Procedures Act, despite lack of monetary damages, as purpose of that law is to prevent such frauds); *City Select Auto Sales, Inc.*,

12

296 F.R.D. at 309–10 (rejecting argument that plaintiff subjected to unwanted faxes had to identify "specific harms" beyond invasion of privacy in order to have Article III standing to bring claim under Telephone Consumer Protection Act).[14]

### F.   FACTA Is Not An Unusual Statute

It is common for Congress to employ privacy protections in the financial space. Moreover, the law contains other examples of statutes that, like FACTA, employ a flat-rule method, designed to solve the problem of harms that are difficult to quantify, measure, and trace. Where these potential harms are prevalent and highly destructive to our financial markets, Congress's best tool to combat them is to elevate the rights of the harmed party.

Particularly instructive are commercial cases involving allegations of breach of fiduciary duty.  In its recent decision in *Donoghue v. Bulldog Investors General Partnership*, the Second Circuit addressed the concreteness element of the Article III standing of a plaintiff alleging violation of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), which proscribes "short-swing" trading.  696 F.3d 170, 177–78 (2d Cir. 2012).  Pursuant to § 16(b) "when a stock purchaser chooses to acquire a 10% beneficial ownership stake in an issuer, he becomes a corporate insider and thereby accepts the limitation that attaches to his fiduciary status: not to engage in any short-swing trading in the issuer's stock.  At that point, injury

---

[14]  *See also Salvati v. Deutsche Bank Nat'l Trust Co., N.A.*, 575 F. App'x 49, 52–53, 56 (3d Cir. 2014) (mortgage borrower could seek statutory damages under Fair Debt Collection Practices Act against law firm that had handled foreclosure action against him and had unsuccessfully attempted to collect from him more fees than were allowed under applicable state law); *Feder v. Williams-Sonoma Stores, Inc.*, No. 2:11-03070 (WHW), 2011 U.S. Dist. LEXIS 109739, at *1–2, *5–6 (D.N.J. Sept. 26, 2011) (Walls, J.) (consumer had Article III standing to pursue statutory-damages-only claim under New Jersey consumer-protection law against merchant that had allegedly mishandled credit card transaction, because she "alleged that she was personally subject to the conduct that she allege[d] violate[d]" that law); *cf. Pichler*, 542 F.3d at 390–91 (co-plaintiff spouses of workers whose motor vehicle information was unlawfully accessed in course of unionization campaign would have had Article III standing to bring Driver's Privacy Protection Act claims if their names had been on the registrations for the vehicles in question).

depends not on whether the § 16(b) fiduciary traded on inside information but on whether he traded at all." *Donoghue*, 696 F.3d at 177 (internal brackets, quotation marks, and citation omitted); *see also DiLorenzo v. Edgar*, No. 03-841-SLR, 2004 U.S. Dist. LEXIS 4991, at *6 (D. Del. Mar. 24, 2004) (recognizing stockholder's Article III standing to sue under § 16(b) for recovery of short-swing trading profits). Equally, Congress may assign fiduciary duties to a handler of consumers' credit card information insofar as to not publish that information. *See Spokeo*, 136 S. Ct. at 1549 ("[I]t is instructive to consider whether an alleged intangible harm has a close relationship to a [traditional] harm . . . .").

The purpose and effects of § 16(b) and FACTA are analogous. Both were solutions to pervasive problems that harmed both individuals and U.S. markets. Both statutes were required because the actual harms—insider trading and identity theft—were difficult to prove at law, requiring a flat rule to prevent them. Congress "'elevat[ed] to the status of legally cognizable injuries[']" the privacy invasion caused by FACTA's prohibited conduct; such harms amount to "[']concrete, *de facto* injuries that were <u>previously</u> inadequate in law.'" *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 578) (emphasis added).

The pervasiveness of harm caused by identity theft and insider trading cannot be questioned. *Donoghue*, 696 F.3d at 174 (Congress recognized a "widespread use of confidential information by corporate insiders to gain an unfair advantage in trading their corporations' securities." (internal quotation marks and citation omitted)); *cf.* 149 Cong. Rec. 26,891 (2003) (statement of Sen. Richard Shelby, in support of passage of FACTA) ("As our economy has grown more automated, more electronic transactions occur without the lender and borrower ever meeting face to face. As a result, the transfer of information has become much more pervasive,

and a new crime has emerged that takes advantage of this flow of information[:] identity theft . . . .").

Indeed, the Supreme Court's description of § 16(b) sounds nearly identical to FACTA:

Those courts have recognized that the only method Congress deemed effective to curb the evils of insider trading was <u>a flat rule</u> taking the profits out of a <u>class of transactions</u> in which the <u>possibility of abuse was believed to be intolerably great</u>. . . .

In order to achieve its goals, Congress chose a relatively <u>arbitrary rule capable of easy administration</u>.  The objective standard of Section 16 (b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation.  <u>This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof.  Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect</u>."

*Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972) (emphases added) (internal quotation marks and citation omitted).

Similarly, in both circumstances, Congress recognized that the difficulties in quantifying and tracing the harm called for a flat rule preventing the conduct that causes the harm.  *Compare Donoghue*, 696 F.3d at 176 ("Judge Learned Hand observed that '[i]f only those persons were liable, who could be proved to have a bargaining advantage, the execution of the statute would be so encumbered as to defeat its whole purpose.'" (quoting *Gratz v. Claughton*, 187 F.2d 46, 50 (2d Cir. 1951) (Hand, J.))), *with Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010) ("The actual harm that a willful violation of FACTA will inflict on a consumer will often be small or difficult to prove. . . .  That actual loss is small and hard to quantify is why statutes such as the [FCRA] provide for modest damages without proof of injury.") (internal quotation marks and citation omitted).[15]

---

[15]  Notably, § 16(b) imposes even greater penalties on violators than does FACTA.  Even where a § 16(b) violator <u>never</u> traded on insider information, a § 16(b) violator must disgorge <u>all</u> of the profits associated with <u>all</u> violating transactions.  Here, J. Crew, by choosing to accept Plaintiff's

**IV.       J. Crew's Arguments All Fail**

J. Crew's arguments concerning why Plaintiff did not suffer a concrete injury all fail for additional reasons beyond those set forth above.

A.  J. Crew's Reliance on *Reilly* Is Misplaced

Ignoring Plaintiff's theory of harm in the form of invasion of a statutorily protected privacy right, J. Crew instead prefers to mount its assault entirely on the concreteness of Plaintiff's alternative, risk-based harm theory.[16]  (Defs.' Br. at 8–10).  In doing so, J. Crew asks this Court to extend the Third Circuit's ruling in *Reilly v. Ceridian Corp.*[17] to this, different area of the law, even though the Third Circuit itself has already declined to apply *Reilly* elsewhere.[18]

*Reilly* is inapposite here for the same reason that the Supreme Court remanded *Spokeo* (instead of merely dismissing it)—in both circumstances, the plaintiffs have invented new theories of harm that were not the harms that Congress intended in passing the statutes at issue,

_____

credit card, voluntarily took on the fiduciary duty not to harm the integrity of Plaintiff's financial information.  *See Donoghue*, 696 F.3d at 177 ("Drawing an analogy between trust law and the fiduciary duty created by § 16(b), Judge Hand observed that '[n]obody is obliged to become a director, an officer, or a 'beneficial owner'; just as nobody is obliged to become the trustee of a private trust; but, as soon as he does so, he accepts <u>whatever</u> are the limitations, obligations and conditions attached to the position, and any default in fulfilling them is as much a 'violation' of law as though it were attended by the sanction of imprisonment.'" (quoting *Gratz*, 187 F.2d at 49) (adding emphasis)).

[16]  *See* Am. Compl. ¶¶ 19–22, 41.

[17]  664 F.3d 38 (3d Cir. 2011).

[18]  The lead defendants in *Google Cookie* and *Nickelodeon II* tried, but failed, to persuade the Third Circuit that the standing analysis performed in data-breach cases should be applied to allegations of invasions of statutorily protected privacy rights.  *Compare* Answering Br. of Def.-Appellee Google Inc. at 19–20, 24, *Google Cookie*, No. 13-4300 (3d Cir. Apr. 7, 2014) (citing *Reilly*, 664 F.3d at 40–44), *and* Br. of Appellee Viacom Inc. at 13, *Nickelodeon II*, No. 15-1441 (3d Cir. June 15, 2015) (citing same), *with Google Cookie*, 806 F.3d at 130–53 (making no reference to *Reilly* and confirming plaintiffs' constitutional standing), *and Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *3–80 (no reference to *Reilly*; Article III standing affirmed).

and therefore could not have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit." *Spokeo*, 136 S. Ct. at 1549; *accord Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *21.[19]

While Plaintiff here alleges <u>exactly</u> the privacy-invasive harm <u>twice</u> contemplated by Congress—printing Mr. Kamal's private data—the plaintiffs in *Reilly* and other similar cases do not rely on Congressional determinations of harm, but instead attempt to weave a theory of harm by alchemizing the FCRA's mandate to institute "reasonable procedures" for the "furnishing of consumer reports" into a requirement to implement specific computer data security.  15 U.S.C. §§ 1681a(f), 1681b, 1681e; *see, e.g.*, Consol. Class Action Compl. ¶¶ 77–83, *In re Horizon Healthcare Servs., Inc. Data Breach Litig.*, No 2:13-cv-07418-CCC-JBC (D.N.J. June 27, 2014), Dkt. No. 36, *dismissed*, 2015 U.S. Dist. LEXIS 41839 (D.N.J. Mar. 31, 2015) (Defs.' Br., Ex. D).

Accordingly, the constitutional standing inquiry performed in data-breach cases has no relevance in cases involving statutorily protected rights that have been clearly defined by Congress—such as the printing of the specific financial information detailed in FACTA.  *See Spokeo*, 136 S. Ct. at 1549 ("'Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.'" (quoting *Lujan*, 504 U.S. at 580)).

---

[19]  Similarly misplaced is J. Crew's reliance on *Crisafulli v. Ameritas Life Ins. Co.*, No. 13-5937, 2015 U.S. Dist. LEXIS 56499, at *3-4 (D.N.J. Apr. 30, 2015) (Defs.' Br. Ex. B).  In that case, the pro se plaintiff's bizarre theory of harm in was that he was somehow placed at risk of identity theft because his Social Security number <u>could</u> be visible through the window of a letter sent to him by his insurer, <u>if</u> the envelope were manipulated in a certain way while in transit to him. The court found that none of the FCRA provisions upon which the plaintiff relied were even implicated by such alleged conduct. *Id.* at *14–15.

B. J. Crew's Reliance On *Spokeo*'s Dicta
   <u>Concerning "Bare" Violations Is Misplaced</u>

J. Crew suggests that <u>any</u> violation of FACTA, standing alone, is nothing more than what Justice Alito deemed a "bare procedural violation" insufficient to confer Article III standing. (Defs.' Br. at 11). This is a woeful twisting of Justice Alito's dicta, and a desperate attempt to raise the bar for Article III standing, which requires a mere "trifle" of injury. *Danvers Motor Co.*, 432 F.3d at 294 (internal quotation marks and citation omitted). However, *Nickolodeon II* makes clear that this dicta has no relevance <u>here</u>, where "*Congress* has[] provided plaintiffs with the right to seek redress for unauthorized disclosures of information that, in Congress's judgment, ought to remain private." *Nickelodeon II*, 2016 U.S. App. LEXIS 11700, at *22 (citing *Google Cookie*, 806 F.3d at 134 & n.19).

Moreover, Justice Alito made clear that Article III standing will <u>only</u> be found lacking when the plaintiff alleges statutory violations that are totally "divorced" from <u>any</u> "concrete interest that is affected by the deprivation" of a "procedural right" granted by Congress. *Spokeo*, 136 S. Ct. at 1549 (internal quotation marks and citation omitted). By way of example, he noted that there is virtually no possibility that dissemination of an incorrect zip code on a consumer report could give rise to the type of harm that the FCRA was designed to protect consumers against. *Id.* at 1550; *see also id.* at 1553 (Thomas, J., concurring) (individual consumer likely would not have Article III standing to sue Spokeo for violating FCRA's requirement to post toll-free phone number that can be used to request file disclosures).

In effect, J. Crew's risk of harm argument amounts to a factual disagreement with Congress's determination that harm emanates from J. Crew's violation,[20] and an accusation that

---

[20]   J. Crew acknowledges that Congress recognized the relationship between printing Plaintiff's data and the increased risk to Plaintiff of that printing. (Defs.' Br. at 2–3, 8–10). Indeed, no

Congress was incompetent in determining that these procedural violations caused imminent harm. Yet, J. Crew offers no facts as to how this is so.

    C.   *Spokeo* Does Not Require Plaintiffs To Show Pecuniary
          <u>Harm In Order To Establish Article III Standing</u>

J. Crew next attempts to undermine *Spokeo* by suggesting that risk-based harms are never cognizable at law, unless those risks are medical in nature. (Defs.' Br. at 9–10). Thus, according to J. Crew, Plaintiff must have suffered quantifiable pecuniary harm in order to have a concrete claim. (Defs.' Br. at 8–9 (arguing Plaintiff lacks Article III standing because he has not suffered economic harm in the form of identity theft resulting from J. Crew's FACTA-violating handling of his private financial information)). This is just an attempt by J. Crew to re-litigate the law of the case, which it has already lost. This Court has already held that Plaintiff does not have to plead actual, financial harm in order to establish an injury in fact under FACTA. (Op. Denying Defs.' First Mot. to Dismiss Am. Compl. 3–4 (Dkt. No. 33)) (Plaintiff plausibly pleads that J. Crew's FACTA violations were willful, entitling him to statutory damages).

Moreover, *Spokeo* repeatedly gives examples of risk-based harms outside of the medical context. *See Spokeo*, 136 S. Ct. at 1549 ("This does not mean, however, that the risk of real harm cannot satisfy the requirement of concreteness. . . . [T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact." (citation omitted)).

---

party herein contests that this risk was the very reason Congress passed FACTA in the first place.

In fact, the *Spokeo* Court made clear that "intangible injuries can nevertheless be concrete." *Id.* at *15.[21]   When it passed and then modified FACTA, Congress identified an unreasonable invasion of privacy in the form of exposure to identity theft, the very harm Plaintiff alleges herein.  *See* Am. Compl. ¶¶ 19–26, 41–42.  As Justice Thomas explained, "[a] plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right."  *Spokeo*, 136 S. Ct. at 1553 (Thomas, J., concurring) (citing *Havens Realty Corp.*, 455 U.S. at 373–74 (standing for violation of the Fair Housing Act); *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 137–38 (1939) (Standing exists when "the right invaded is a legal right, —one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege.")).

D. *Spokeo* Recognizes That The Danger Of Third-Party
   Misconduct Gives Rise To Article III Standing

J. Crew also argues that Plaintiff could not have suffered a concrete, risk-based harm, because the manifestation of this harm into an easily quantifiable harm requires the independent actions of a third party.  (Defs.' Br. at 8–10).  *Spokeo* flatly rejects this premise, noting that numerous common-law torts allow for redress of harms that are dependent upon third-party conduct for manifestation.  *See Spokeo*, 136 S. Ct. at 1549 (citing as examples libel and slander *per se*, the harm from both of which depends on the choice of third-parties to believe the false information about the plaintiff); *see also NCAA*, 730 F.3d at 222 (If it were true "[']that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons," then "it is difficult to see how libel actions or suits for inducing breach

---

[21]   Indeed, FACTA has a two-part test, one for actual damages where identity theft has occurred <u>or</u> another, where there is no immediate loss, with statutory damages of not less than $100 and not more than $1,000.  *See* 15 U.S.C. § 1681n(a)(1)(A).

of contract could be brought in federal court[.]'" (quoting *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.))).

In fact, the very harm alleged by the plaintiff in *Spokeo*—one not flatly rejected by the *Spokeo* court—was that the falsities in Spokeo's reports <u>could</u> influence the decisions of <u>third-party</u> employers.  *Spokeo*, 136 S. Ct. at 1556 (Ginsburg, J., dissenting) (". . . Robins' complaint already conveys concretely [that] Spokeo's misinformation causes actual harm to his employment prospects." (internal brackets, quotation marks, and record citation omitted)); *see also Bennett v. Spear*, 520 U.S. 154, 169 (1997) (plaintiff had Article III standing where alleging "injury produced by determinative or coercive effect upon the action of [a third party]").  Similarly, here the publication of a consumer's credit card data causes actual harm to his financial integrity by increasing the probability that third parties will act to his detriment.

## V.        Plaintiff Has Established All Article III Standing Requirements

J. Crew's motion argues <u>only</u> that Plaintiff has not alleged an injury in fact for failure to allege a concrete harm.  (Defs.' Br. at 8).  J. Crew does not dispute that Plaintiff has established the other elements of Article III standing, namely, that: (1) J. Crew violated Plaintiff's own, particularized, legally protected interest, by printing more than five digits of his credit card number on the sales receipts at the points of sale, *see* Am. Compl. ¶¶ 68–70; (2) this Court can redress J. Crew's violation of FACTA by awarding statutory and/or punitive damages as provided by the statute, *see* 15 U.S.C. § 1681n(a)(1)(A), -(2); and (3) the scourge of credit card identity theft through printed receipts presented such an actual threat that it twice merited Congressional legislation in the past 13 years.

## CONCLUSION

J. Crew asks this Court to make Article III standing something that it is not: an insurmountable mountain.  For the reasons set forth above, Plaintiff respectfully requests that this Court reject J. Crew's attempt to undermine *Spokeo* and this Circuit's long-held, and recently confirmed, standing principles.  In the event that this Court agrees with any part of J. Crew's motion, Plaintiff requests leave to amend so as to cure any deficiencies in the Amended Complaint.

Dated: June 29, 2016

**FRANK LLP**

By: */s/ Marvin L. Frank*
    Marvin L. Frank (MF1436)
    Gregory A. Frank (Pro Hac Vice)
    mfrank@frankllp.com
    gfrank@frankllp.com
    275 Madison Avenue, Suite 705
    New York, New York 10016
    (212) 682-1853 Telephone
    (212) 682-1892 Facsimile

    **ROBERT A. SOLOMON, P.C.**
    Robert A. Solomon (RS2895)
    rsolomon@metrolaw.com
    91 Pacific Street
    Newark, NJ 07105
    (973) 344-6587 Telephone
    (973) 344-7604 Facsimile

    **NABLI & ASSOCIATES, P.C.**
    Peter Y. Lee (PL2405)
    peter.lee@leeadvocates.com
    Khaled (Jim) El Nabli (Not Admitted)
    Jim_elnabli@nablilaw.com
    60 East 42nd Street, Suite 1101
    New York, New York 10165
    (212) 808-0716 Telephone
    (212) 808-0719 Facsimile

    *Counsel for Plaintiff and the Class*